IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Matthew Trewhella, et al.,

Plaintiffs,

-vs-

City of Findlay, et al.,

Defendants.

Case No. 3:07 CV 2372

MEMORANDUM OPINION AND ORDER

JUDGE JACK ZOUHARY

## I. INTRODUCTION

Plaintiffs Matthew Trewhella, Michael Marcavage, and Missionaries to the Preborn ("Missionaries") allege their constitutional rights were violated by Defendants City of Findlay, Ohio ("City"), Mayor Anthony Iriti, and Police Chief William Spraw when Defendants halted Plaintiffs' July 31, 2007 demonstration in Findlay. This case began August 3, 2007 when Plaintiffs filed a Complaint (Doc. No. 1) and a Motion for a Temporary Restraining Order (Doc. No. 2) against Defendants. The parties quickly reached a Stipulation (Doc. No. 5) which enabled Plaintiffs to return to Findlay to demonstrate on August 10, 2007. However, the Stipulation did not resolve the entire case because Defendants refused to pay legal fees Plaintiffs incurred in filing the Complaint and Motion. Therefore, an assessment of liability must be made to determine whether Defendants are responsible for Plaintiffs' legal fees (which have undoubtedly increased exponentially since August 6, 2007, when the Stipulation was filed, in light of all the discovery and briefing required to reach this point).

Before the Court is Plaintiffs' Motion for Findings of Fact, Conclusions of Law, and Final Judgment (Doc. No. 42) pursuant to Federal Civil Rules 52 and 58. Defendants filed a Response (Doc. No. 46) to which Plaintiffs filed a Reply (Doc. No. 51). In light of the following findings of fact and conclusions of law, the Court finds Defendants violated Plaintiffs' First Amendment rights and are therefore obligated to pay Plaintiffs' legal expenses under 42 U.S.C. §§ 1983 and 1988.

## II. FINDINGS OF FACT

The standard of proof for the Court to make findings of fact in a civil case is by a preponderance of the evidence. *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993).

### A. Stipulated Facts

The parties filed a Joint Stipulation of Fact (Doc. No. 36) which the Court adopts. A summary of the relevant facts follows.

Plaintiff Matthew Trewhella is an ordained Christian minister and director of activities for the Missionaries. Plaintiff Michael Marcavage was a volunteer assisting Missionaries during its efforts in Findlay on July 31, 2007. Missionaries was acting on behalf of its approximately 60 volunteers who were engaged in efforts to promote a pro-life message on July 31 and August 10. In the past, Missionaries traveled to various public fora in proximity to a roadway intersection where significant numbers of motorists are likely to travel. Once so located, Plaintiffs hold large signs containing photos and written messages expressing a viewpoint against the practice of abortion, spending approximately an hour and a half at each location. Plaintiffs also speak to passers-by about the Christian faith and distribute pro-life literature.

Defendant William Spraw is the Chief of the Findlay Police Department. Defendant Anthony Iriti was Mayor of Findlay from January 2004 until December 2007. Both are sued in their respective individual and official capacities.

The intersection of Tiffin Avenue and Bright Road in Findlay is an area of high volume vehicular traffic. These streets are five-lane thoroughfares, and traffic is regulated at the intersection by traffic lights. The streets are bordered by grassy areas, beyond which are sidewalks, and commercial properties are found further set back in an area of ample open space. The intersection and the sidewalks nearby constituted the site chosen by Plaintiffs to promote their pro-life message on July 31 and August 10.

On July 31, at approximately 11:30 a.m., Plaintiffs gathered at the intersection of Tiffin Avenue and Bright Road and began to express their pro-life message. The parties stipulate the demonstration was conducted in the following manner:

- There were 50-60 participants.
- The participants stood approximately 30-50 feet apart from one another in pedestrian rights of way adjacent to both sides of Tiffin Avenue near where Tiffin Avenue intersects Bright Road.
- On both sides of Tiffin Avenue, the participants were spread out at approximately 150 yards west of the intersection and 100 yards east of the intersection.
- In the immediate vicinity of the intersection, some stood closer to one another (within 15 feet).
- The participants each held a sign or a flag.
- Plaintiffs used 13 different sign designs during the July demonstration, with some designs appearing on more than one signboard. The dimensions of the signs ranged from 42 in. x 56 in. to 65 in. x 44 in.
- Some participants held literature to distribute to pedestrians.

- On the corners proximate to the intersection, two persons stood, each using a megaphone to communicate to passers-by.
- Some of the participants distributed literature to occupants of motor vehicles stopped at the light, at times stepping off of the curb and onto the roadway, not part of a crosswalk.

Plaintiffs planned to demonstrate at the intersection until about 1:00 p.m. At about 11:37 a.m., the Findlay Police Department began receiving calls from citizens complaining about the demonstration. At 11:40 a.m., the Police Department dispatched Officer Rollin Rhoads to the scene.

Upon hearing the dispatch, Chief Spraw (who was already in his vehicle) also proceeded to the scene and, while en route, spoke to Mayor Iriti. Chief Spraw approached the southwest corner of Tiffin Avenue and Bright Road, where Trewhella, Marcavage, and some other volunteers were standing. One of Plaintiffs' volunteers video-recorded 12 minutes and 46 seconds of the ensuing conversation between Chief Spraw and Plaintiffs. As a result of this conversation, Trewhella eventually told the participants to leave the scene.

Trewhella, Marcavage, and the Missionaries did not apply for a permit from the City prior to the July demonstration. Marcavage requested a copy of the applicable permit policies after they left the intersection, and the Mayor's office faxed him the All Events Policy ("AEP"). Marcavage was told a permit could not be issued in time for Plaintiffs to demonstrate the following day. The AEP is issued solely on the Mayor's authority; it is not a City ordinance.

Eileen Benson was the Findlay Safety Director and Administrative Services Director from February 2004 until January 2008. In that position, she was second only to Mayor Iriti for issuing permits. In fact, Benson authored the AEP. Although Mayor Iriti had final permit approval, the AEP delegated authority to Benson, among others, to approve permit applications. Benson consulted with other City officials as needed to review a permit request, but she alone signed the approval for nearly

all applications submitted during her tenure. Benson also possessed and exercised authority to add or waive conditions to the permit.

There were no accidents, incidents, or injuries of any kind during either the July or August demonstrations.

**B. Disputed Facts**

The key factual dispute between the parties is the basis on which Chief Spraw ordered the participants to cease demonstrating. Plaintiffs argue Chief Spraw was enforcing the AEP, as instructed by Mayor Iriti. Defendants claim Plaintiffs were violating various Findlay ordinances,[1] and Chief Spraw ordered Plaintiffs to leave because of these alleged ordinance violations, not because Plaintiffs failed to obtain a permit under the AEP.[2]

The Court finds Defendants were in fact enforcing the AEP when Chief Spraw ordered Plaintiffs to leave the intersection. This conclusion is amply supported by the videotaped conversation between Chief Spraw and Plaintiffs ("Video," Doc. No. 36, Ex. 4) and by the dispatch tape of Chief Spraw's instructions (Doc. No. 36, Ex. 3, track 10).

In the video recording Chief Spraw tells the crowd:

> You will need an event permit from the City, and we will determine the time, place, and manner where that will occur, okay? I have just talked to the Mayor's office, and you're also impeding traffic, creating a hazard, and you need to move it, and you will

---

1 The ordinances cited by Defendants include: § 509.10 (noise); § 509.03 (disorderly conduct); § 509.02 (failure to disperse); and § 371.05(a) (pedestrian unlawfully in roadway).

2 Defendants argue at length that because the AEP was not enacted by a legislative arm of the City's government, but rather by Mayor Iriti alone, it served merely as "guidance" and lacks the force of law and therefore cannot be declared unconstitutional or evaluated by this Court. This argument, which emphasizes form over function, is not well taken. Although potentially improper in its form, the AEP served as a *de facto* legally enforceable regulation. It is clear that City officials, from Mayor Iriti to police officers, considered the AEP to be authoritative. Indeed, Plaintiffs were threatened with arrest if they did not obtain a permit.

> need to get an event permit in the City, and we will determine the time, place, and manner that you would like to do that. I don't need a [card], I'm telling you I'm the chief of police, and I've been told by the Mayor that they need you to get a permit.

(Video at 0:18). Chief Spraw repeatedly references Mayor Iriti as the source of his directives to the crowd (*See* Video at 0:55; 2:30; 6:00; 7:06; 8:00; 10:42; 11:10). Chief Spraw tells Plaintiffs to disperse numerous times and threatens arrest (Video at 3:40 and 9:40).

Chief Spraw also refused Plaintiffs' repeated requests that they be allowed to continue their demonstration without using megaphones or having participants approach cars (Video at 1:28 and 7:45).

The videotape provides overwhelming evidence that Chief Spraw was in fact enforcing the AEP at Mayor Iriti's request:

> Chief Spraw: Pack up and move on, sir . . . . You need an event permit. Bottom line.
> Marcavage: If we do that can we leave a few people here on the corners?
> Chief Spraw: No.
> Officer Rhoads: Not until you get the permit.
> Chief Spraw: Not until you get the permit.
>
> * * *
>
> Marcavage: One person would need a permit?
> Chief Spraw: Yes. Then you . . . everybody needs a permit right now.
> Marcavage: Where does the First Amendment come in if you need permission to do something . . .
> Chief Spraw: Sir. Okay. What's going to happen right now is . . . I'm done arguing, okay? We're going to start making arrests for disorderly conduct. If that's what you want, then fine, and then this young lady that was here, the college girl, she's got a criminal record. Is that worth it?
>
> (Video at 9:07).

Based on this direct evidence, the Court finds Chief Spraw was enforcing the AEP at Mayor Iriti's direction during the July 31 demonstration where he ordered Plaintiffs to disperse. Defendants' arguments to the contrary are not only baseless, but, even worse, border on bad faith.

## III. CONCLUSIONS OF LAW

### A. First Amendment Violations

Because the Court finds Defendants applied the AEP, rather than the City's ordinances, when ordering Plaintiffs to cease their activities, the Court will conduct a First Amendment analysis only with respect to the AEP.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of people peaceably to assemble." U.S. CONST. amend. I. In order to evaluate a First Amendment claim, the Court must: (1) determine whether the speech is protected; (2) determine the nature of the forum where the speech is to occur in order to apply the correct standard; and (3) determine whether the justification presented by the government satisfies the applicable standard. *Cornelius v NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 797 (1985).

First, Plaintiffs' display of signs, leafletting, and spoken messages are clearly protected speech. The Supreme Court has held that "peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 U.S. 171, 176 (1983).

Second, Plaintiffs' speech occurred in a traditional public forum -- the City's sidewalks -- and "no particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora." *Frisby v. Schultz,* 487 U.S. 474, 481 (1988).

The level of scrutiny applied to speech in public fora depends on whether the statute at issue is content-based or content-neutral. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983). When the regulation is content-neutral, the government may "enforce regulations of the

time, place, and manner of expression" so long as they are "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Id.*

Here, the AEP is content-neutral on its face. Ostensibly, it is enforced without regard to the nature of the message an applicant seeks permission to convey. Because it is content-neutral, the City may adopt "time, place, and manner" regulations, so long as such regulations are narrowly tailored pursuant to *Perry*.

Plaintiffs challenge the AEP, both as it was applied to them on July 31, 2007 and on its face. The Court will address the facial challenge first. A facial challenge is "the most difficult challenge to mount" because "the challenger must establish that no set of circumstances exists under which the Act would be valid." *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 194 (6th Cir. 1997) (internal quotations omitted). In First Amendment contexts, however, the overbreadth doctrine "provides that the government may not proscribe a 'substantial' amount of constitutionally protected speech judged in relation to the statute's plainly legitimate sweep." *Phelps-Roper v. Strickland*, 539 F.3d 356, 360 (6th Cir. 2008). "'Overbreadth' has also been used to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.13 (1984).

Plaintiffs attack the constitutionality of a number of the aspects of the AEP, including the requirement to obtain a permit; the broad discretion afforded to a few individuals; and the 30-day notice requirement. Again, the City must meet its burden under the appropriate level of scrutiny for its time, place, and manner restrictions, such that the AEP provisions must be "narrowly tailored to

serve a significant government interest and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45.

Permit Requirement

Part II of the AEP delineates instances in which a permit is required (Doc. No. 1-2):

II. TYPE OF EVENTS AFFECTED BY THE PLAN

A. Events open to the public, such as festivals and celebrations, in which any of the following apply:
1. Are held on City property.
2. Involve City right-of-way.
3. Have an impact on parking on City streets.
4. Require closure of any City street.
5. Otherwise require alteration of traffic routes through the City.
6. Use any City-owned property or material.
7. Require the assistance, other than for pre-planning, of City employees, before, during, or after the event. This is particularly important if the involved City employees are needed for security, fire inspection, or for standby fire protection, and must be called in to work on off-duty time.
8. Involve outdoor sound or electrical systems for all or part of the event.

B. Private social events, such as wedding or block parties, to which any of the following apply:
1. Involve the City right-of-way.
2. Have an impact on parking on City streets.
3. Require closure of any City Street.
4. Use any City-owned property or material.
5. Require the assistance, other than for pre-planning, of City employees, before, during, or after the event, and must be called in to work on off-duty time.
6. Involve outdoor sound or electrical systems for all or part of the event.

C. Construction projects or other private business events, to which any of the following apply:
1. Involve the City right-of-way.
2. Have an impact on parking on City streets.
3. Require closure of any City street.
4. Require a waiver of City Ordinance traffic and other requirements for routing of heavy equipment, oversize loads; or otherwise requiring City approval by operation of Ordinance.

The Court finds the permit requirement is unconstitutional. The permit requirement is a prior restraint because it conditions speech on the prior approval of public officials. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553-58 (1975). Any system of prior restraint bears "a heavy presumption against its constitutional validity." *Id.* at 557. "When a law predicates expressive activity on the prior acquisition of a permit, the law must contain narrow and precise standards to control the discretion of the permitting authority." *Parks v. Finan*, 385 F.3d 694, 699 (6th Cir. 2004) (*citing Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992)).

Part I of the AEP is a statement that the AEP is endorsed by the City's administration. Part III of the AEP sets forth the procedures required to obtain a permit, including the documentation required as part of the application. Notably absent are any criteria for granting a permit. This absence, buttressed by the stipulated fact that Mayor Iriti and the Safety Director had sole and absolute authority over administering the plan, leaves this Court with only one conclusion: the AEP's permit requirement is unconstitutional.

This permit scheme grants the City virtually unchecked discretion to deny permits for content-based reasons. There are no objective standards by which the City is bound when considering whether to issue a permit.

In addition to the complete absence of standards, the Court finds the permit scheme overbroad for the simple fact that it appears to apply to all sorts of speech. "It is offensive not only to the values protected by the First Amendment, but to the very notion of a free society -- that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 165-66 (2002). The decision in *Watchtower* is instructive here. In

that case, the Supreme Court considered a local ordinance which prohibited "'canvassers' and others from 'going in and upon' private residential property for the purpose of promoting any 'cause' without first having obtained a permit." *Id.* at 154. The village did not charge for the permit, and permits were routinely issued after the applicant filled out detailed paperwork. *Id.* at 154-55.

The *Watchtower* court listed three reasons it found such expansive permit requirements offensive to the First Amendment. First, "[t]he requirement that a canvasser must be identified in a permit application filed in the mayor's office and available for public inspection necessarily results in a surrender of that anonymity." Second, "requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech of citizens holding religious or patriotic views" such that it "will prevent them from applying for such a license." Third, "there is a significant amount of spontaneous speech that is effectively banned." *Id.* at 167.

In *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005), the court found a municipal ordinance regulating parades to be unconstitutional because it applied too broadly to include small groups of individuals. The *Dearborn* ordinance defined "special event" as "any walkathon, bikeathon, or jogging group or other organized group having a common purpose or goal, proceeding along a public street or other public right-of-way." *Id.* at 608. The court found this provision to be overly broad, noting that "[p]ermit schemes and advance notice requirements that **potentially apply to small groups** are nearly always overly broad and lack narrow tailoring." *Id.* (emphasis added). *Dearborn* found 200 individuals comprised a "small group." Here, the number of participants was between 50 and 60 individuals.

The AEP does not define "event," but Defendants appear to construe the term quite broadly to include a small group of individuals displaying signs on the City's sidewalks, such as Plaintiffs.

Under this interpretation, virtually any activity can be deemed an "event" by Mayor Iriti or the Safety Director and require a permit. Failing to obtain a permit requires participants to disperse under the threat of arrest.

30-Day Notice Requirement

Part III of the AEP explains how an individual obtains a permit, including what documents must be submitted with the application. Plaintiffs challenge the constitutionality of a 30-day notice provision in Part III. The relevant section states: "Seek permission as early as possible, and as far in advance of the event as possible. A **minimum of 30 days' notice in advance of the event is required**, except in unusual circumstances, such as overside loads or commercial deliveries" (Doc. No. 1-2) (emphasis added).

The AEP's 30-day notice requirement is unconstitutional. "Any notice period is a substantial inhibition on speech" because notice provisions can "stifle our most paradigmatic examples of First Amendment activity." *Dearborn*, 418 F.3d at 605. "[T]he simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations discourages citizens from speaking freely." *Id.* (*quoting NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984)). This concern is "heightened further where, as here, the notice period restricts the public's use of streets and sidewalks for political speech." *Id.* Under this rubric, the *Dearborn* court found a 30-day notice requirement, akin to that at issue here, to be unconstitutional.

The Court agrees with the City that it has a significant interest in providing for traffic and crowd control for certain events in order to protect the public's safety and welfare. However, the AEP's 30-day notice provision burdens substantially more speech than is necessary to accomplish this

legitimate goal and is not narrowly tailored to serve the City's interests. Given the apparent negligible effort required by the City to approve a permit application, it is unclear why 30 days are required. "Such a substantial inhibition on speech cannot be justified by the [government's] failure to respond to requests in a more timely fashion." *Id.* at 606.

Because the Court finds various provisions of the AEP unconstitutional on its face, *a fortiori* Plaintiffs' rights were violated during their July demonstration, and the Court need not analyze Plaintiffs' as-applied challenge.

**B. Liability Under Section 1983**

Having determined that Plaintiffs' First Amendment rights were violated, the Court turns to the issue of liability of Defendants under Section 1983.

***1. The City***

In *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 692 (1978), the Supreme Court limited municipal liability under Section 1983 to occasions when local governments took actions "under color of some official policy." Generally, "a municipality cannot be held liable under Section 1983 under a theory of respondeat superior; rather, a plaintiff must plead and prove an injury caused by an action taken 'pursuant to official municipal policy of some nature.'" *Emery v. City of Toledo*, 178 F.3d 1294 at *3 (6th Cir. 1999) (table) (*quoting Monell*, 436 U.S. at 691).

"'Official policy' often refers to formal rules or understandings -- often but not always committed to writing -- that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time.'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481.

Furthermore, "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690-91.

Applying these rules to the facts in this case, the Court has little difficulty concluding the City is liable under Section 1983 for the First Amendment violations. While the AEP was adopted in a mayoral vacuum without legislative approval, the City approved the custom of giving its Mayor authority over event planning. Mayor Iriti was the figurehead of the City, and City officials routinely acquiesced to his implementation of the AEP. This was not the case of a rogue mayor going off the reservation and engaging in a discrete unapproved act.

### *2. Mayor Iriti and Chief Spraw Individually*

Plaintiffs have also sued Mayor Iriti and Chief Spraw in their individual capacities. Mayor Iriti and Chief Spraw argue they are entitled to the defense of qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Nader v. Blackwell*, 545 F.3d 459, 473 (6th Cir. 2008) (quotations omitted). Qualified immunity involves a two-step inquiry. First, the Court must ask whether "the facts alleged show the official's conduct violated a constitutional right." *Id.* If the answer is affirmative, the Court must then "ask whether the right was clearly established." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Id.*

Here, the Court finds Mayor Iriti and Chief Spraw are not liable in their individual capacities because Plaintiffs failed to satisfy their burden of proof. "Qualified immunity is an affirmative

defense that, once asserted, shifts the burden of proof to the plaintiff to show that the defendant is not entitled to qualified immunity." *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008). Plaintiffs' briefs fail to address whether the First Amendment rights denied to them were "clearly established."

## IV. CONCLUSION

The Court finds Defendants enforced the AEP when they demanded Plaintiffs cease their July demonstration. The Court further finds the AEP is facially unconstitutional and that the City is liable to Plaintiffs.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

December 31, 2008